DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9-9-10_

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
SAMSUN LOGIX CORP.,                 :
                                    :
                       Plaintiff,   :
                                    :
        - against -                 :
                                    :
BANK OF CHINA, ET AL.,              :
                                    :
                       Defendants.  :
-----------------------------------X
```

10 Civ. 4203 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

This motion for remand requires the Court to first consider a rarely-used removal statute found in the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), 9 U.S.C. § 205 ("§ 205"), and then a theory of removal, apparently making its debut here, that premises federal jurisdiction on reading the Edge Act's removal provision, 12 U.S.C. § 632 ("§ 632"), with § 4(b) of the International Banking Act of 1978 ("IBA"), 12 U.S.C. § 3102(b). For the reasons discussed below, the Court holds that neither ground allows this case to remain in federal court.

## I. BACKGROUND[1]

---

[1] The facts below are taken from the following documents and any exhibits submitted therewith: Petition Pursuant to CPLR Art. 4, CPLR §§ 5222, 5224, 5225, and 5227 ("Petition"); Memorandum of Law in Support of Petitioner's Motion to Remand to the Supreme Court of the State of New York, County of New York, dated June 7, 2010; Harwood Declaration in Support of Plaintiff's Motion to Remand to the Supreme Court of the State of New York, County of New York, dated June 7, 2010; Memorandum of Law of Defendants Bank of China, Bank of Communications Co. Ltd., China Construction Bank Corporation, China Merchants Bank Co., Ltd., Industrial and Commercial Bank of China Limited and Agricultural Bank of China

On July 24, 2009, Samsun Logix Corp. ("Samsun"), a South Korean shipping company currently in bankruptcy proceedings, obtained a foreign arbitral award from a London tribunal against three Chinese companies, Dalian Dong Zhan Group Co. Ltd., Beitai Iron & Steel Group Importing & Exporting Co. Ltd., and Hong Kong Dongzhan Logistics Ltd. (collectively, "Judgment Debtors") in connection with a breach of a maritime contract. After months of litigation in a separately captioned case, Samsun Logix Corp. v. Dalian Dong Zhan Group Co. Ltd., et al., No. 08 Civ. 9458, this Court entered an Order, dated March 5, 2010, (the "March 2010 Order") confirming the London arbitral award and entering judgment in favor of Samsun against the Judgment Debtors in the sum of $6,582,272.24. On April 8, 2010, Samsun registered the transcript of the March 2010 Order with the County Clerk, New York County, thus rendering this Court's judgment a New York state judgment. See N.Y. C.P.L.R. § 5018(b). The Judgment Debtors have not yet paid.

On April 21, 2010, Samsun filed the Petition and an Order to Show Cause in support of the Petition in the Supreme Court of the State of New York, County of New York ("State Court").

Limited in Opposition to the Motion to Remand, dated June 21, 2010; Declaration of Marika Maris, dated June 21, 2010; Reply in Support of Petitioner Samsun Logix Corp.'s Motion to Remand Its Action to the Supreme Court of the State of New York, County of New York, dated July 2, 2010. Unless specifically referenced, no further citation to these sources will be made.

-2-

The Petition named twelve banks ("Respondents"), including Bank of China ("BOC"), Bank of Communications Co. Ltd. ("BOCOM") and Standard Chartered Bank ("Standard Chartered").[2]

The Petition requests (1) that Respondents turn over whatever Judgment Debtor's property "as may be in [Respondent's] possession, [2] that property of the Judgment Debtors within the possession of [Respondents] but located outside New York State be Ordered brought into the State, and [3] that such property be turned over to [Samsun] in satisfaction of the New York Judgment up to and including the sum of $6,582,272.25 plus accruing interest." (Petition at 9.) The Petition relies on Koehler v. Bank of Bermuda Ltd., 911 N.E.2d 825, 831 (N.Y. 2009), which held, on a certified question from the federal Court of Appeals for the Second Circuit, that under N.Y. C.P.L.R. § 5225(b) "a New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property regardless of whether the defendant is a judgment debtor or a garnishee." On April 23, 2010, the New York Supreme Court ordered Respondents to show

---

[2] The Respondents named in the Petition were BOC, Bank of America ("BofA"), BOCOM, China Construction Bank Corporation ("Construction Bank"), China Merchants Bank Co., Ltd. ("Merchants Bank"), Chinatrust Commercial Bank, Ltd. ("Chinatrust"), Industrial and Commercial Bank of China Limited ("Industrial Bank"), Shinhan Bank, Standard Chartered, Oversea-Chinese Banking Corporation Limited ("Oversea Bank"), Agricultural Bank of China Limited ("Agricultural Bank"), and Hong Kong and Shanghai Banking Corporation Limited ("HSBC").

cause by May 14, 2010 (later enlarged to June 7, 2010), why the Petition should not be granted.

On May 24, 2010, BOC and BOCOM filed a Notice of Removal with this Court, premising their assertion of federal jurisdiction on reading the removal provision of the Edge Act, 12 U.S.C. § 632, with § 4(b) of the IBA, 12 U.S.C. § 3102(b). Standard Chartered soon after filed a Supplemental Notice of Removal, asserting this Court's jurisdiction under the theory advanced by BOC and BOCOM as well as under § 205. Samsun then filed the instant motion seeking to remand the case to the State Court.

Four of the Respondents -- Shinhan Bank, Oversea Bank, Standard Chartered and BofA -- have been dismissed by Samsun since the Petition was first filed. Chinatrust and HSBC apparently have never been served and have yet to appear. As a result, only six of the original twelve Respondents remain active in this action: BOC, BOCOM, Construction Bank, Merchants Bank, Industrial Bank, and Agricultural Bank (collectively, the "Banks"). The Banks are all incorporated in the People's Republic of China and licensed by United States government authorities to conduct certain business in the United States. Only BOC and BOCOM (together, the "Federally Chartered Branches") are licensed under federal law. The New York branches of four of the other Banks --

-4-

Construction Bank, Merchants Bank, Industrial Bank, and Agricultural Bank -- are licensed under New York state law.

## II. **DISCUSSION**

### A.   REMOVAL PURSUANT TO THE CONVENTION

As noted, Standard Chartered filed a Supplemental Notice of Removal asserting jurisdiction based on § 205. Although Standard Chartered was subsequently dismissed from this action, all of the Banks have adopted its argument as a basis for removal.

"Subject matter jurisdiction under § 205 raises 'a difficult and novel question.'" Banco De Santander Cen. Hispano v. Consalvi Int'l, Inc., 425 F. Supp. 2d 421, 427 (S.D.N.Y. 2006) ("Banco") (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 588 (1999)). "Few published decisions concern § 205 removal and fewer still address removal and subject matter jurisdiction at any length. Morever, the sparse authority which exists is split ...." Id. Section 205 has been described as "the broadest removal statute in the federal code." Acosta v. Master Maintenance & Constr., Inc., 52 F. Supp. 2d 699, 703 (M.D. La. 1999).

Section 205 provides, in relevant part:

Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding ....

-5-

9 U.S.C. § 205.    The Banks argue that the instant action
"relates to" an award within the scope of the Convention
because the Petition mentions that the garnishment it seeks is
in satisfaction of a judgement ultimately arising out of
foreign arbitration.[3]  In support, the Banks rely on the broad
interpretation some courts have given § 205.   See Beiser v.
Weyler, 284 F.3d 665 (5th Cir. 2002); Banco, 425 F. Supp. 2d
at 421.

In Beiser, the Fifth Circuit examined the "relates to"
language in § 205 in light of a state court action brought by
plaintiff  Fred  Beiser  ("Beiser")  against  a  number  of
defendants.    The defendants attempted to remove the state
lawsuit to federal court under § 205 on the grounds that any
dispute between Beiser and the defendants was subject to
arbitration in London pursuant to an agreement between the
defendants and Horizon Energy Limited, of which Beiser was the
director and only employee.

The Fifth Circuit held that the "relates to" language in
§ 205  was broad enough to "encompass the relationship between
the arbitration clauses in the agreements and Beiser's suit,"
even though Beiser as an individual was not a signatory to the

_____

[3] The Banks also argue that the association in the Court's Electronic Case
Filing system between this case and Samsun's action to enforce the foreign
arbitral award in Samsun Logix Corp. v. Dailian Dong Zhan Group Co. Ltd.,
et al., No. 08 Civ. 9458, satisfies § 205.  The Court rejects outright the
Bank's attempts to construe this Court's administrative procedures as a
judgment that it has subject matter jurisdiction over the present matter.

-6-

arbitration agreement. Id. at 669. The Beiser Court reasoned that "[w]henever an arbitration agreement falling under the Convention could *conceivably* affect the outcome of the plaintiff's case, the agreement 'relates to' the plaintiff's suit." Id. (emphasis in original). Therefore, a "district court will have jurisdiction under § 205 over just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense. As long as the defendant's assertion is not completely absurd or impossible, it is at least conceivable that the arbitration clause will impact the disposition of the case." Id. As a result, Beiser's state action was properly removed to federal court because it was not frivolous to argue that Beiser himself may have been bound by the arbitration agreement and his state suit subject to mandatory arbitration.

In Banco, a court in this District adopted the "broad" interpretation of § 205 from Beiser to hold that motions to vacate a foreign arbitration award were removable under § 205. 425 F. Supp. 2d at 428. In doing so, Banco diverged from two other district courts, HSMV Corp. v. ADI Ltd., 72 F. Supp. 2d 1122, 1127 n.8 (C.D. Cal. 1999), Tesoro Petroleum Corp. v. Asamera (S. Sumatra) Ltd., 798 F. Supp. 400, 404-05 (W.D. Tex. 1992), that disallowed removal of vacatur motions under § 205 because "under the Convention, district courts do not have

-7-

original jurisdiction over vacatur actions." 425 F. Supp. 2d at 428. See also Virginia Sur. Co. v. Certain Underwriters at Lloyd's, London, 671 F. Supp. 2d 996, 998 (N.D. Ill. 2009) (noting that Banco was wrongly decided).

The Banks also rely on York Hannover Holding A.G. v. Amer. Arbitration Ass'n, 794 F. Supp. 118 (S.D.N.Y. 1992) and Acosta, 52 F. Supp. 2d 699, which each considered arbitration not completed at the time the decisions were issued. In York Hannover Holding A.G., the plaintiff filed a petition in New York state court seeking dismissal of the panel assigned to conduct an arbitration. The petition was properly removed to federal court because passing on the panel's jurisdiction required interpreting the terms of the arbitration agreement between the parties. "[T]he appointment process as directed by the [arbitration] rules forms an integral part of the arbitration agreement," such that a "sufficient relationship" existed "between the provisions of the arbitration agreement and what York s[ought] to accomplish." 794 F. Supp. at 122.

Acosta concerned a mustard gas leak at a Georgia Gulf facility in Louisiana and "two [defendant] foreign insurers claim[ed] that their insurance policies require[d] that all coverage issues between Georgia Gulf and themselves be resolved through arbitration." 52 F. Supp. 2d at 702. The plaintiffs argued that their lawsuit did not relate to this

-8-

arbitration agreement because they were not signatories to the agreement. The <u>Acosta</u> court, applying a four-factor test and interpreting Louisiana law, held that the plaintiffs' state court action did relate to the arbitration agreement because "[w]ithout the insurance contracts, plaintiffs have no claim against either of the insurers, and the dispute to be arbitrated directly impacts their possible recovery from those insurers." <u>Id.</u> at 707.

In the instant case, even were the Court to adopt the broad theory of <u>Beiser</u>, no arbitration agreement or award "relates to" Samsun's suit because neither could "conceivably affect the outcome of [Samsun's] case." <u>Beiser</u>, 284 F.3d at 669 (emphasis omitted). The Banks, non-parties to both the underlying arbitration agreement and award, offer no argument that the arbitration agreement or award will affect Samsun's state law action under <u>Koehler</u> to attach assets sought to satisfy the March 2010 Order. Indeed, the Banks' only arguments about the Petition's merits concern whether the so-called "separate entity" rule was impacted by <u>Koehler</u>, <u>see</u> <u>Cronan v. Schilling</u>, 100 N.Y.S.2d 474, 476 (N.Y. Sup. Ct. 1950) ("a warrant of attachment served upon a branch bank does not reach assets held for, or accounts maintained by, the defendant in other branches or in the home office. The theory of these decisions is that for purposes of attachment, among

-9-

others, each branch of a bank is a separate entity, in no way concerned with accounts maintained by depositors in other branches or at the home office."), aff'd 282 A.D. 940 (App. Div. 1st Dept 1953), or whether the rule of Koehler comports with due process. See Koehler, 911 N.E.2d at 833 (Smith, J., dissenting) ("I have serious doubt that [a garnishee's amenability to the personal jurisdiction of a New York court] is enough contact under International Shoe[ Co. v. Washington, 326 U.S. 310 (1945)] to justify the enforcement of a non-New York judgment by a non-New York creditor against a non-New York debtor, to recover an asset that is located [outside the United States].")

In contrast to the fact patterns in Beiser, Acosta, and York, which all arose before arbitration had been completed, here the Banks are unable to argue that an arbitration agreement provides a defense or other procedural hurdle to a state court action or other proceeding because in this case the arbitration is already completed. Furthermore, unlike Banco, the Banks are not seeking to vacate or modify an arbitration award. In sum, no close reading of the arbitration agreement or award is required here. The incantation of the word "arbitration" somewhere in the record of a case does not convey federal jurisdiction.[4]

---

[4] Samsun also argues that removal is improper because Chinatrust and HSBC did not consent to removal under the Convention. Because the Court has determined that the Convention does not allow removal of this case, the

-10-

B.   REMOVAL PURSUANT TO THE INTERNATIONAL BANKING ACT AND 12
     U.S.C. § 632

Pushing a novel theory, the Banks also contend that this
Court has jurisdiction over the instant action under a reading
of the removal provision of the Edge Act, 12 U.S.C. § 632,
with § 4(b) of the IBA, 12 U.S.C. § 3102(b).

The Court will begin with a review of § 632.   This
statute allows a federal court to exercise jurisdiction over
actions that (1) include as a party a corporation organized
under the laws of the United States and (2) arise out of
transactions involving international or foreign banking or
other financial operations.[5]   See Bank of Am. Corp. v. Braga
Lemgruber, 385 F. Supp. 2d 200, 213 (S.D.N.Y. 2005); see also
New Mexico ex rel. Foy v. Vanderbilt Capital Advisors, LLC,
No. CIV 09-0178, 2009 WL 3672921, at *3 (D.N.M. Apr. 13, 2009)

---

Court need not resolve whether the rule of unanimity applies to § 205,
whether Chinatrust and HSBC were properly served, or whether Chinatrust
and HSBC are nominal defendants.  Compare Vistra Trust Co. v. Stoffel, No.
08 Civ. 2844, 2008 WL 5454126, at *4-*6 (S.D.N.Y. Dec. 29, 2008) (applying
rule of unanimity to removal under § 205) with Acosta, 52 F. Supp. 2d at
707-09 (holding that rule of unanimity does not apply to removal under §
205).

[5] The statute provides in pertinent part:

> Notwithstanding any other provision of law, all suits of a civil
> nature at common law or in equity to which any corporation organized
> under the laws of the United States shall be a party, arising out of
> transactions involving international or foreign banking ... or out
> of other international or foreign financial operations, either
> directly or through the agency, ownership, or control of branches or
> local institutions ... shall be deemed to arise under the laws of
> the United States ... and any defendant in any such suit may, at any
> time before the trial thereof, remove such suits from a State court
> into the district court of the United States ....

12 U.S.C. § 632.

(noting that § 632 "is a unique statute in which the presence of a federal jurisdictional grant transforms what would otherwise be a state court action into a claim arising under the laws of the United States.").

The Banks do not, at first blush, satisfy § 632's first requirement: they are all organized under the laws of China and not under the laws of the United States.  To overcome this deficiency, the Banks resort to the IBA, which states that "operations of a foreign bank at a Federal branch or agency shall be conducted with the same rights and privileges as a national bank at the same location."  12 U.S.C. § 3102(b).[6]

---

[6] The statute provides in full:

> In establishing and operating a Federal branch or agency, a foreign bank shall be subject to such rules, regulations, and orders as the Comptroller considers appropriate to carry out this section, which shall include provisions for service of process and maintenance of branch and agency accounts separate from those of the parent bank. Except as otherwise specifically provided in this chapter or in rules, regulations, or orders adopted by the Comptroller under this section, operations of a foreign bank at a Federal branch or agency shall be conducted with the same rights and privileges as a national bank at the same location and shall be subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the National Bank Act to a national bank doing business at the same location, except that (1) any limitation or restriction based on the capital stock and surplus of a national bank shall be deemed to refer, as applied to a Federal branch or agency, to the dollar equivalent of the capital stock and surplus of the foreign bank, and if the foreign bank has more than one Federal branch or agency the business transacted by all such branches and agencies shall be aggregated in determining compliance with the limitation; (2) a Federal branch or agency shall not be required to become a member bank, as that term is defined in section 221 of this title; and (3) a Federal agency shall not be required to become an insured bank as that term is defined in section 1813(h) of this title. The Comptroller of the Currency shall coordinate examinations of Federal branches and agencies of foreign banks with examinations conducted by the Board under section 3105(c)(1) of this title and, to the extent possible, shall participate in any simultaneous examinations of the United States operations of a foreign bank requested by the Board under such section.

A "Federal branch or agency" is defined as a branch or agency of a foreign bank established in the United States and operating under 12 U.S.C. § 3102. See 12 U.S.C. § 3101(5) - (6). Two of the Banks -- the Federally Chartered Banks -- are Federal branches. The Banks thus contend that the "rights and privileges" that the "operations of a foreign bank at a Federal branch or agency" to which they are entitled include the ability to remove certain lawsuits under § 632. The Court is not persuaded that Congress contemplated the Banks' version of corporate alchemy by legislative gloss.

1. Language and Purpose of the IBA and § 632

As a starting point, the plain language of the IBA does not embody the expansive sweep that the Banks suggest. See Universal Church v. Geltzer, 463 F.3d 218, 223 (2d Cir. 2006) ("Statutory interpretation always begins with the plain language of the statute, assuming the statute is unambiguous.") The statute here speaks only of the "operations" of a foreign bank. 12 U.S.C. § 3102(b). To read "operations of a foreign bank" as equating to a "foreign bank" renders the term "operations" surplusage. See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 698 (1995) (expressing "reluctance to treat statutory terms as surplusage"). If Congress had intended to treat

---

12 U.S.C. § 3102(b).

-13-

federally chartered branches of foreign banks exactly as national banks, then it could have done so by removing the word "operations" and stating that a foreign bank at a Federal branch shall be treated with the same rights and privileges as a national bank at the same location.    Instead, Congress explicitly chose to make "operations" of foreign banks the subject of its solicitude. But in this case, the "operations" of foreign banks are not the defendants, the Banks themselves are.

Further, § 4(b) of the IBA is but one subpart of a statutory scheme that contemplates regulation of federally chartered branches by the Comptroller of the Currency ("Comptroller").    In this regard, the IBA speaks not in general of "rights and privileges," but of treatment by the Comptroller. See S. Rep. No. 95-1073, at 7 (1978), reprinted in 1978 U.S.C.C.A.N. 1421, 1427 ("The Section establishes a comprehensive regulatory and supervisory framework for federal branches and agencies that will be administered by the Comptroller.    In general, operations of a foreign bank at a Federal branch or agency shall be conducted with the same rights and privileges ... [as] a national bank doing business at the same location.").    Reading §4(b) of the IBA this way -- as setting forth a regulatory framework to be implemented by the Comptroller that requires parity of treatment between national and federally-chartered foreign banks -- harmonizes

-14-

§4(b) with §§ 4(a) and 4(c) of the IBA, each of which sets forth rules for federally chartered branches to follow when interacting with the Comptroller. See 12 U.S.C. § 3102(a) (rules for establishing a federal branch with the Comptroller); § 3102(c) (various concerns that Comptroller shall consider in granting federal charters). In contrast to this more straight-forward approach, the Banks' preferred reading casts "rights and privileges" as an aberration in the statutory scheme that reaches far beyond the immediate subject matter of the statute's concern with the Comptroller's regulations.

The context in which the IBA and § 632 were passed confirms that the laws have little to do with each other. Section 632 "was incorporated into the Edge Act of 1919 by the Banking Act of 1933, commonly know[n] as the Glass-Steagall Act, as part of the comprehensive overhaul of the national banking system enacted during the Great Depression. The overall objectives of the Edge and Glass-Steagall Acts were to establish and strengthen the national banking system and stimulate international trade by providing a uniform national regulatory apparatus." New Mexico ex rel. Foy, 2009 WL 3672921, at *2; see also A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp., 62 F.3d 1454, 1462 (D.C. Cir. 1995) (history of Edge Act and § 632); Travis v. National Bank of N.Y., 23 F. Supp. 363, 367 (E.D.N.Y. 1938) (holding that §

-15-

632's application is not limited to corporations created under the Edge Act).

The IBA, enacted in 1978, was intended "to provide foreign banks with national treatment under which foreign enterprises ... are treated as competitive equals with their domestic counterparts." Conference of State Bank Supervisors v. Conover, 715 F.2d 604, 606 (D.C. Cir. 1983) (quotation marks omitted). Before the IBA's passage, the operation of United States branches of foreign banks was left to individual states, which allowed foreign banks to enjoy some competitive advantages over domestic banks. "[T]he IBA establishe[d] the principle of parity of treatment between foreign and domestic banks in like circumstances." Id. (quotation marks omitted); see also National Commercial Banking Corp. of Austl., Ltd. v. Harris, 532 N.E.2d 812, 817-820 (Ill. 1988) (examining purpose of the IBA).

The forty-five year gap between the passage of the Edge Act and the IBA, as well as their different aims, further counsels against twisting the IBA's language to activate § 632's jurisdictional powers. As Samsun argues, it is an overdetermined reading of § 632 that would find federal jurisdiction properly exercised over entities -- federally-chartered branches of foreign banks -- that did not exist until decades after the Edge Act's passage and amendment by the Glass-Steagall Act.

-16-

## 2. Courts Have Unanimously Found That The IBA Does Not Have Jurisdictional Implications

Courts that have plumbed the IBA for jurisdictional anchors have come up empty-handed. See Elmaliach v. Bank of China, 09 Civ. 2130, 2010 WL 1172829, at *10 (S.D.N.Y. Mar. 26, 2010); McHugh v. Westpac Banking Corp., No. 93 Civ. 3058, 1995 WL 243339, at *4 (N.D. Ill. Apr. 25, 1995); R.W. Sawant & Co. v. Kozloff, Inc., 507 F. Supp. 614 (N.D. Ill. 1981). These three cases all interpreted the IBA in conjunction with 28 U.S.C. § 1348, which determines that national banking associations are citizens of the state in which they are located.[7]

In R.W. Sawant & Co. -- which included defendant Standard Chartered Bank Ltd., incorporated under the laws of the United Kingdom and conducting banking business in Illinois -- the court held that § 9(b) of the IBA, 12 U.S.C. § 3106(a), was "not a jurisdictional grant." 507 F. Supp. at 616. Instead, § 9(b) of the IBA required "every branch of a foreign bank conducting operations in the United States to comply with any federal or state law which applies to national banks or

---

[7] The statute provides in pertinent part:

> All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located.

28 U.S.C. § 1348.

state-chartered banks."[8]  Id.  This requirement could not be
read with 28 U.S.C. § 1348 to allow diversity jurisdiction.
Id. at 616-17.  The court noted that if 28 U.S.C. § 1348 was
intended to apply to foreign banks, Congress "would have
amended that section in either the [IBA] or the Financial
Institutions Regulatory and Interest Rate control Act of 1978
... which added section 9(b) [to the IBA]."  Id. at 617.

The court next concluded that § 632 also did not provide
jurisdiction because no party was organized under federal law
and "section 632 is to be read literally."  Id. at 618.
Further, § 9(b) of the IBA did not allow § 632 to apply either
because "§ 632 is not a substantive provision" which banks are

---

[8] Section 9(b) of the IBA provides in pertinent part:

(1) Every branch or agency of a foreign bank and every commercial
lending company controlled by one or more foreign banks or by one or
more foreign companies that control a foreign bank shall conduct its
operations in the United States in full compliance with provisions
of any law of the United States or any State thereof which--

(A) impose requirements that protect the rights of consumers
in financial transactions, to the extent that the branch,
agency, or commercial lending company engages in activities
that are subject to such laws;

(B) prohibit discrimination against any individual or other
person on the basis of the race, color, religion, sex, marital
status, age, or national origin of (i) such individual or
other person or (ii) any officer, director, employee, or
creditor of, or any owner of any interest in, such individual
or other person; and

(C) apply to national banks or State-chartered banks doing
business in the State in which such branch or agency or
commercial lending company, as the case may be, is doing
business.

12 U.S.C. § 3106(a).

required to comply with under §9(b) of the IBA, "but a grant of jurisdiction." Id.

In McHugh, the defendant -- an Australian banking corporation with a federally-chartered branch in Chicago -- argued that it should, under § 4(b) of the IBA, be "subject to the specific jurisdictional grant and designation of citizenship of [12 U.S.C.] § 1348 which by its terms applies to national banking associations." 1995 WL 243339, at *2. The McHugh court rejected this argument and, after analyzing the legislative history and intent of the IBA to achieve uniformity of treatment and comparative parity between foreign and domestic banks, held that the IBA "does not contain a jurisdictional grant." Id. at *2-*4. The court concluded that though Congress has an interest in "providing federal courts with jurisdiction over matters which may implicate international relations, the absence in the [IBA] of a provision extending [28 U.S.C.] § 1348 to foreign banks with federal branches in the United States cannot be viewed as a congressional oversight even though the [IBA] sought to create competitive parity between international and national banks." Id. at *4.

Finally, in Elmaliach, the defendant -- BOC, with branches in New York -- advanced an identical line of reasoning as the defendant in McHugh, arguing that when § 4(b) of the IBA is read in conjunction with 28 U.S.C. § 1348, BOC

should be considered a citizen of New York for purposes of diversity jurisdiction. The Elmaliach Court joined McHugh in rejecting this argument and denied federal diversity jurisdiction, reasoning that Congress did not intend for the IBA to convey jurisdictional implications. See 2010 WL 1172829, at *10 (citing R.W. Sawant & Co and McHugh and noting "the only two courts that have addressed this issue have concluded that the IBA does not include or effect a jurisdictional grant").

Though the Banks contend that these cases are inapposite because they considered diversity and not federal question jurisdiction, the Court is not persuaded. These three cases all considered whether the IBA had jurisdictional implications in general and their reasoning did not depend on any unique aspects of diversity jurisdiction.

The Court, however, is mindful that these cases considered that the federal government has a special interest in international banking. In this sense, preventing the Banks from removing the instant action to federal court could be viewed as allowing plaintiffs to forum shop between federal and state rules regarding international banking. But Congress apparently did not evince such concern. When enacting § 632, it chose not to make every action involving international banking a federal concern. Instead, jurisdiction under § 632 requires both international banking and a corporation

organized under the laws of the United States.   This Court cannot simply erase the latter requirement from the federal code.   See Diaz v. Pan Am. Fed. Sav. & Loans Ass'n., 635 F.2d 30, 32 (1st Cir. 1980) ("[W]e are unable to believe that Congress intended [§ 632] to reach all cases in which a bank is a party.").

In particular, the limits of removal under § 632 are amply demonstrated by this case.   The Banks' argument under the IBA and § 632 exists only because the Federally Chartered Branches happen to be parties to this litigation.   Without them, at least four of the other Respondents would remain in the State Court as they are licensed under New York state law and do not purport to be entitled to special treatment under the "rights and privileges" clause of § 4(b) of the IBA, which applies only to federally-chartered entities.

Ultimately, the Banks' argument pivots from weakness to weakness -- that the term "operations" of a federally-chartered bank actually refers to the bank itself as a legal entity and that "rights and privileges" of those operations includes removal under § 632.   Even in the special context of § 632, where a "federal court should be cautious about remand, lest it erroneously deprive [a] defendant of the right to a federal forum," Jana Master Fund, Ltd. v. JP Morgan Chase & Co., 490 F. Supp. 2d 325, 329 (S.D.N.Y. 2007), the Banks' chain of logic is not only strained and slender but too

-21-

conclusory.  Endorsing their reading of these statutes would essentially extend federal jurisdiction to every lawsuit involving a federally-chartered bank, a grant of authority that, if correct, would have lain dormant in the federal code for more than thirty years.  That such an expansive and powerful legislative creature, robust and glaring as a fire-breathing dragon, could have been quietly slipped into the statute books and there remain hibernating between the lines, undetected for such a long time even by the hawk eyes of the banking industry's high-end legal talent, seems inconceivable.  Less paranormally, the appearance of the anomaly at this time suggests something of more recent creation, a chimera sprung whole out of the Banks' deft lawyerly imagination.  In short, if Congress had intended this Court to have such all-encompassing jurisdiction, "it could have stated its intent more easily."  Diaz, 635 F.2d at 32.

### III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion of plaintiff Samsun Logix Corp.
(Docket No. 11) to remand this action to the state court from
which it was removed is GRANTED; it is further

**ORDERED** that the Clerk of Court is directed to remand
this case to New York State Supreme Court, New York County.

The Clerk of Court is directed to terminate all pending
motions and to close this case.

**SO ORDERED.**

Dated:    New York, New York
          08 September 2010

                              VICTOR MARRERO
                                 U.S.D.J.

-23-